NO.   94-206

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

BRIDGER CANYON PROPERTY OWNERS'
ASSOCIATION, INC., a Nonprofit
Corporation,

             Plaintiff and Appellant,

      -v-

THE PLANNING AND ZONING COMMISSION
FOR THE BRIDGER CANYON ZONING DISTRICT
and 360 RANCH CORPORATION, a Nevada
corporation;  and BRIDGER BOWL, INC.,

             Defendants and Respondents.

FILED

MAR   2 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin,
               The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Stephen C. Pohl, Bozeman, Montana

        For Respondent:

        Joseph W. Sabol, Bozeman, Montana (360 Ranch); Mark
        D. Refling, Moore, O'Connell & Refling, Bozeman,
        Montana (Bridger Bowl); Michael Salvagni, Gallatin
        County Attorney, Bozeman, Montana

                        Submitted on Briefs:  January 19, 1995

                                  Decided:  March 2, 1995

Filed:

                    _____
                                Cl'erk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from an Eighteenth Judicial District Court, Gallatin County, denial of a petition for writ of certiorari, We affirm in part and reverse in part.

We redefine the issues on appeal:

1. Did the District Court err in denying the writ of certiorari?

2. Did the Commission err in its conditional approval of 360 Ranch's Planned Unit Development, specifically, its approval of single family housing in the Bridger Bowl Base Area?

FACTUAL AND PROCEDURAL BACKGROUND

Public hearings were held in Bozeman, Montana, in December, 1992 and January and February of 1993 to review the application of 360 Ranch for a Planned Unit Development (PUD) in Bridger Canyon and particularly, Bridger Bowl. The 360 Ranch proposed a "651 acre planned unit development, six zone changes and numerous conditional use permits." The PUD application included "339 units for attached overnight accommodations . . and 151 units for detached recreational housing." The Zoning Ordinance defines "recreational housing" as "'Housing located in the Bridger Bowl Base Area which does not have restriction on length of stay, and includes attached and detached single family units,' and 'single family dwelling' as '[a] detached building designed for, or occupied exclusively by, one family. . . . '" At the conclusion of the hearings, the Planning and Zoning Commission (Commission) conditionally approved

2

the 360 Ranch's application, and Findings of Fact and an Order to that effect were issued on February 10, 1993.

On March 12, 1993, the Bridger Canyon Property Owners Association (BCPOA) filed a complaint for declaratory judgment contending that the 1989, 1990 and 1991 amendments to the Zoning Ordinance were void as a matter of law and that the Commission lacked authority and jurisdiction to approve the PUD because of a conflict between the Bridger Canyon Zoning Ordinance (Zoning Ordinance) and the General Plan and Development Guide of Bridger Canyon (General Plan). The complaint requested relief in the form of a writ of certiorari:

> . .directing the Commission to certify to the Court at a specified time and place a transcript of the record and proceedings as outlined above so that this Court may review the record and proceedings as required by law...and...the Court take testimony on all issues for the purpose of reviewing the decision of the Commission in accordance with Plaintiff's right to appeal the Commission's decision to district court.

Moreover, the appellant requested that the Court enter a declaratory judgment that the Zoning Ordinance failed to substantially comply with the General Plan, that the Commission lacked authority and jurisdiction to approve single family residences in the Bridger Canyon Base Area and that the 1989, 1990 and 1991 amendments to the Zoning Ordinance authorizing single family residences in the Base Area and expanding the Base Area by 360 acres were void as a matter of law as was the Commission's February 10, 1993 Order authorizing single family housing in the Bridger Bowl Base Area. On April 5, 1993, the respondents filed a motion to dismiss asserting that the action was not timely filed,

3

all necessary persons were not made a party to the action and the complaint failed to state a claim upon which relief could be granted.

The appellant filed an amended complaint on April 30, 1993. On June 7, 1993, it sought leave to amend the Amended Complaint for Declaratory Judgment. The respondents brought a renewed motion to dismiss on June 11, 1993. On September 16, 1993, the District Court entered an order concerning the issue of the amended complaint and the respondents' motion to dismiss. The court determined that the amended complaint sought a writ of certiorari on the question of whether the Commission had exceeded its jurisdiction; a declaration that the Zoning Ordinance failed to substantially comply with the General Plan; and an order voiding the amendments expanding the base area by 360 acres and authorizing single family residences.

The court concluded that the appellant was beyond the statute of limitations for challenging amendments to the Zoning Ordinance but that it could challenge the Commission's 1993 decision to issue the conditional use permit by means of a writ of certiorari because the appellant filed his complaint within 30 days. The court denied the respondents' motion to dismiss "as to a judicial review of the conditional use permit decision."

On November 10, 1993, BCPOA filed an amended complaint and petition for a writ of certiorari contending that the Commission exceeded its jurisdiction in approving the PUD and seeking an order reversing that part of the Commission's order authorizing single

4

family housing in the Bridger Bowl Base Area. BCPOA contends that the Zoning Ordinance does allow single family housing development while the General Plan does not allow such housing, and therefore, the two planning documents are in conflict.

In its final amended complaint and petition for writ of certiorari, the appellant in essence, was requesting two forms of relief - a writ of certiorari (Requests for relief nos. 1 and 2) and appellate review of the Commission's Findings of Fact and Order (Request for relief no. 3). The court denied the petition for writ of certification on the merits, concluding that the Board was acting within its jurisdiction because the Zoning Ordinance complied with the General Plan. The court did not address Request No. 3, the appeal of the Commission's February 10, 1993 order under § 76-2-110, MCA.

Moreover, respondents defended on the merits of the Commission acting within its jurisdiction - all parties, in fact, acquiesced in the assumption that a writ of certiorari was the appropriate basis upon which to proceed.

Because of the procedural posture in which this case was placed and argued before and disposed of by the District Court, it is necessary that we first review the decision of the District Court to deny the writ of certiorari and then address the appeal of the Commission's conditional approval of the PUD.

At the outset, we note that the record reflects that the Bridger Canyon Zoning District and the Bridger Canyon Zoning Commission were created by resolution of the Gallatin County Board

of Commissioners in July, 1971. That same year, the General Plan and the Zoning Ordinance were adopted. Both planning documents have been amended over the years. Moreover, in 1985, another document was adopted, entitled the "Bridger Bowl Base Area Plan," (Base Area Plan), that plan being amended in 1989. Other pertinent facts will be provided in the body of the opinion.

DISCUSSION

Writ of Certiorari

Section 27-25-102(2), MCA (1993), sets forth the criteria under which a writ of certiorari may be granted. That section provides:

A writ or review may be granted by:
. . .
(2) the supreme court or the district court or any judge of those courts, when a lower tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction of the tribunal, board, or officer and there is no appeal or, in the judgment of the court, any plain, speedy, and adequate remedy.

The scope of review for a writ of certiorari "cannot be extended further than to determine whether the inferior tribunal, board, or officer has regularly pursued the authority of such tribunal, board, or officer." Section 27-25-303, MCA.

State v. McAllister (1985), 218 Mont. 196, 199, 708 P.2d 239, 241, states that there are three indispensable requisites to the grant of a writ of certiorari, including:

I. excess of jurisdiction, i.e. that an inferior tribunal or board has exceeded its jurisdiction;
2. absence of the right to appeal from the act, order or judgment assailed as done or made without jurisdiction; and
3. lack of a plain, speedy and adequate remedy other than certiorari. (Citation omitted.)

6

Despite that <u>McAllister</u> incorrectly joins the statutory requirement for the complete absence of appeal with the statute's grant of discretion to the court to determine that, alternatively, there is no plain, speedy and adequate remedy (insertion of the word "and" instead of "or" between paragraphs 2 and 3 mentioned above), our prior interpretations of the statute remain clear. In order for a writ of certiorari to issue, it is necessary for the petitioner to show (1) that the lower tribunal has acted in excess of its jurisdiction and (2) that the petitioner either has no appeal or, in the judgment of the court, any plain, speedy and adequate remedy. Both tests must be satisfied, and if either or both elements are not established, then the court is without jurisdiction to issue the writ. See City of Helena v. Buck (1991), 247 Mont. 313, 315, 806 P.2d 27, 29.

We conclude, after a careful review of the applicable statutory and case law that a writ of certiorari is not the appropriate remedy in the instant case. Here, the second prong of the statute - remedy of appeal - could not be satisfied as a matter of law.

The District Court addressed the first prong of the test, i.e. whether the tribunal, board or officer exceeded its jurisdiction, and found that the Commission acted within its jurisdiction and therefore, denied the writ of certiorari. <u>McAllister,</u> 708 P.2d at 241.

At no point, however, did the District Court address, nor did the respondents argue, that a writ of certiorari was an

inappropriate remedy because the appellant already had a remedy of appeal. Absence of the right to appeal or a plain, speedy and adequate remedy is the second prong of the test for the grant of a writ of certiorari. <u>McAllister,</u> **708** P.2d at 241. Although we disagree with the District Court in its conclusion that the **Commission** did not exceed its jurisdiction, we determine that the appellant had an adequate remedy of appeal under § 76-2-110, MCA, and therefore, the appellant cannot satisfy the second prong of the test for obtaining a writ of certiorari.

As stated above, in order to grant a writ of certiorari, both prongs of the test **must** be satisfied. Here, because the second prong of the test was not satisfied, we must affirm the District Court's denial of the writ of certiorari, although we affirm because we conclude that the appellant failed to satisfy the second prong of the test. We do not affirm the court's conclusion on the first prong.

Parenthetically, we wish to make clear that whenever a plaintiff or petitioner has any remedy of appeal or, in the court's judgment, any plain, speedy or adequate remedy, a writ of certiorari is <u>not</u> appropriate. Here, the appellant has a remedy of appeal under § 76-2-110, MCA, and therefore, appellant should not have petitioned for a writ of certiorari. The appellant should only have exercised its right to appeal under the appropriate **statute,** in this case, § **76-2-110,** MCA.

Appeal Under § 76-2-110, MCA.

8

As pointed out above, the District Court did not address appellant's appeal of the Board's decision to conditionally approve the PUD. With respect to the court's failure in that regard, our review is plenary. Greytak v. RegO Co. (1993), 257 Mont. 147, 150, 848 P.2d 483, 485. Black's Law Dictionary, Fifth Edition (1979), at 1038, defines "plenary" as "full, entire, complete, absolute, perfect, unqualified." Although the District Court did not review the BCPOA's appeal of the Commission's decision to conditionally approve 360 Ranch's PUD, this Court has full and complete authority to review the Board's decision.

Request for relief No. 3 of the appellant's amended complaint and petition for relief seeks appellate review of the portion of the Commission's Findings of Fact and Order of February 10, 1993, which authorized single family housing in the Bridger Bowl Base Area. At the time appellant filed its petition for certiorari, the Commission's decision was final and appealable under § 76-2-110, MCA. The facts alleged and the arguments made to the District Court on the issue of whether the Commission exceeded its jurisdiction in authorizing the PUD are necessarily the same as those which will be reviewed here in order to determine whether the Commission erred in conditionally approving the PUD. Hence, the underlying issues, the substantive law applicable to those issues and the substantive relief requested and denied, were and would have been the same whether the procedural device to place those issues and law before the court was denominated a petition for

9

certiorari or an appeal. In either event, this Court would have jurisdiction to review the decision of the District Court.

The appellant argues that the Commission exceeded its jurisdiction, thereby acting illegally, by approving the 360 Ranch's PUD application, which "although in compliance with the Bridger Canyon Zoning Ordinance, conflicts with the Bridger Canyon General Plan and Development Guide, and is inconsistent with the official Zoning Map for the district." For this reason, the appellant contends that the Commission erred in approving the PUD. Moreover:

> [t]he Association submits that...a conflict exists between the General Plan and the official zoning map on the one hand, which exclude single family housing in the Bridger Bowl Base Area, and the Zoning Ordinance and Base Area Plan, which make provision for a high density subdivision in the Base Area. Because of this conflict, and in light of the paramount importance accorded by this Court to land use plans in several important zoning decisions, the Association submits that the Zoning Commission exceeded its authority when it approved single **family** housing in the Bridger Bowl Base Area.

The respondents, on the other hand, assert:

> 1. That the General Plan and all amendments thereto are documents to offer guidance to the Commission in its decisionmaking process in the Zoning District.
> 2. That the 1989 updated Bridger Bowl Base Area Plan is incorporated in the 1989 General Plan and is intended to offer guidance to the Commission in its decisionmaking process in the Bridger Bowl Base Area.
> 3. That the General Plan, as the name implies (General Plan and Development Guide), is exactly that, a general plan for the entire District containing guidance for the development of the entire District except as provided in the Bridger Bowl Base Area by the Base Area Plan.
> 4. That the Bridger Bowl Base Area Plan is a site specific portion of the General Plan.

The crucial question is - of what importance is the General Plan and what part does it play in the development of the Bridger

10

Canyon Zoning District? The Zoning Ordinance states that "[p]ursuant to Section 76-2-101 et. seq. of the Revised Codes of Montana there is hereby adopted a development pattern. Said development pattern shall consist of the Bridger Canyon General Plan and the Bridger Canyon Zoning Ordinance." By its very language, the Zoning Ordinance states that the General Plan is an important part of the development pattern, and therefore, it makes sense that the commissioners should be required to comply with the General Plan. Our prior case law supports that conclusion.

Little v. Board of County Com'rs, Etc. (1981), 193 Mont. 334, 631 P.2d 1282, was an appeal by the Flathead County Commissioners, from a district court order enjoining them from proceeding with a resolution of intent to zone Cameron Tract for commercial use when the recommendation of the comprehensive plan (master plan) was to zone the area as residential. In response to the question of how closely the comprehensive plan must be followed, this Court stated:

> The question then becomes one of how closely the governing body must follow the "comprehensive development plan" (master plan) when creating zoning districts and when promulgating zoning regulations. Section 76-1-605, MCA, particularly deals with how an adopted master plan shall be used in making zoning decisions:
>> After adoption of the master plan, the city council, the board of county commissioners, or other governing body within the territorial jurisdiction of the board shall be guided by and give consideration to the general policy and pattern of development set out in the master plan in the . (4) adoption of zoning ordinances or resolutions." (Emphasis in original.)
> This statute unequivocally tells local governing bodies that once a master plan is adopted, it must be used for their guidance in zoning. Further the zoning statutes covering county zoning, Title 76, Ch. 2, sections 76-2-101 through 76-2-112, MCA, undeniably lead to the conclusion that the master plan is of paramount

11

importance. In fact, the unmistakable message of these statutes is that if no comprehensive plan (master plan) has been adopted (section 76-2-201, MCA), and if no jurisdictional area has been created after the adoption of the master plan (section 76-2-202, MCA), the counties are without authority to zone except on an interim basis.

The objective under these statutes is that there be the final adoption of a master plan, and then that the master plan be followed once it has been adopted. The planning and organization statutes (sections 76-1-101 through 76-2-112, MCA) set out a step-by-step basis by which a master plan is to be derived. The term "comprehensive development plan" contained in section 76-2-201, refers back to these organization and planning statutes. As we have already mentioned, without a master plan in effect and without a jurisdictional area carved out after the adoption of the master plan, the counties have no authority to institute permanent zoning classifications.

Little, 631 P.2d at 1291. Moreover,

[t]he vital role given the planning boards by these statutes cannot be undercut by giving the governing body the freedom to ignore the product of these boards -- the master plan. We hold that the governmental unit, -when zoning, must substantially adhere to the master plan. . . .

To require strict compliance with the master plan would result in a master plan so unworkable that it would have to be constantly changed to comply with the realities. The master plan is, after all, a plan. On the other hand , to require no compliance at all would defeat the whole idea of planning. Why have a plan if the local governmental units are free to ignore it at any time? The statutes are clear enough to send the message that in reaching zoning decisions, the local governmental unit should at least substantially comply with the comprehensive plan (or master plan). This standard is flexible enough so that the master plan would not have to be undergoing constant change. Yet, this standard is sufficiently definite so that those charged with adhering to it will know when there is an acceptable deviation, and when there is an unacceptable deviation from the master plan.

As we have explained, the statutes require a reading that the legislature intended the master plan to have substance. If a master plan must be in existence before the county commissioners can permanently zone, and if the right to adopt emergency interim zoning is limited to two years, it makes little sense to then permit the local governing body to ignore the master plan once it has been

created. If the master plan is important enough to be a condition precedent to permanent zoning, it is also important enough to be followed once it is in existence. For these reasons, we hold that only substantial compliance is mandated by the statutes.

We are aware that changes in the master plan may well be dictated by changed circumstances occurring after the adoption of the plan. If this is so, the correct procedure is to amend the master plan rather than to erode the master plan by simply refusing to adhere to its guidelines. If the local governing bodies cannot cooperate to this end, the only alternative is to ask the legislature to change the statutes governing planning and zoning.

Little, 631 P.2d at 1293.

Although Montana Wildlife Federation v. Sauer (1980), 190 Mont. 247, 620 P.2d 1189, stated that no comprehensive plan is necessary when county commissioners act under Part 1, Chapter 2, Title 76, MCA, Little, which was decided after Montana Wildlife, states that once a comprehensive or master plan has been developed, it must be followed. Although Little concerns planning and zoning under §§ 76-2-201 et seq., MCA, the case refers to the statutes at issue here, §§ 76-2-101, et seq., MCA, and the propositions established in Little are applicable to the instant case. The Commission did develop a comprehensive or master plan (the General Plan) and now must comply with that plan.

A more central problem with the planning documents is the fact that they are not only inconsistent with each other, but they are also internally inconsistent. The following language, excerpted from the General Plan, the Zoning Ordinance, the Base Area Plan and the orders amending these documents to enlarge the Base Area of Bridger Canyon, shows an incongruity both within and between the documents. The inconsistencies make it difficult to determine the

13

correct population densities for the various areas within Bridger Canyon.

THE GENERAL PLAN

The General Plan states that:

> The Bridger Canyon Zoning Ordinance was officially adopted in October of 1971, and has been amended on a periodic basis. The intent of the ordinance is to regulate and promote orderly development of the area. <u>Agricultural preservation is a primary goal which is to be accomplished by limiting development to one housing unit per 40 acres, and providing for higher density under planned unit developments. The forty (40) acre minimum lot size is based on limiting population so that the capacity of the two (2) lane highway is not exceeded.</u> Prior to the adoption of the Zoning Ordinance, development was concentrated in parcels less than 20 acres. (Emphasis added.)

The General Plan also states that:

> <u>As set forth in the Zoning Ordinance, maximum permanent housing in the Bridger Canyon planning area is set at one (1) dwelling unit per 20-40 acres, depending on terrain and distance to main roads. One dwelling unit per 20 acres is only allowed throush the Planned Unit Development procedures as set forth in the Zoning Ordinance.</u>  (Emphasis added.)

Moreover, the General Plan provides that:

> Generally<u>, the residential areas outlined in the plan are expected to accommodate one (1) dwelling unit per forty (40) acres or twenty (20) acres with a planned unit development.</u>  (Specific information pertaining to residential densities are located in the Zoning Ordinance and the Bridger Bowl Base Area Plan.)  The ski area is expected to accommodate 3,000 visitors in overnight accommodations on 400 acres--a density of two (2) dwelling units per acre.  <u>Here, multiple clustered housing which does not impair scenic values is essential to accommodate the increasing number of seasonal residents.</u>  (Emphasis added.)

Additionally, the General Plan recommends that the Zoning Ordinance should be strictly enforced to ensure land subdivision in conformity with the General Plan.  Finally, the General Plan states

that "[w]ell-conceived and strongly enforced land use planning is essential."

BASE AREA PLAN

The Base Area Plan states that it is an extension of the General Plan and provides that:

> In 1970 and 1971 the firm of Murray and McCormick, Inc., Sacramento, California, developed a General Plan, Development Guide and Zoning Ordinance for the Bridger Canyon area....
> The Murray and McCormick Plan designated the Bridger Bowl Base Area as Recreation and Forestry, with a basic density right of one unit per 40 acres. It also established a Planned Unit Development (P.U.D.) designation for the Base Area of two units per acre for overnight accommodations if the development was in compliance with the standards and intent of the P.U.D. Section of the Bridger Canyon Zoning Ordinance. The rationale for this high density allocation with overnight qualification (the balance of the Bridger Canyon area has an allowable P.U.D. density of only one unit per 20 acres) was to allow for the expansion of the Bridger Bowl Ski Area to its ultimate capacity without exceeding the vehicular capacity of the two-lane Bridger Canyon Road. (Emphasis added.)

The Base Area Plan also states that:

> The entire Bridger Canyon Zoning District has been given a basic density right of one unit per forty acres, with a planned development designation of one unit per twenty acres. This P.U.D. density is only allowed when a development meets special conditions. (Emphasis added.)

Additionally:

> A major concern of the original planners and the Bridger Canyon residents was that the existing Bridger Canyon Road would not handle the traffic that would be generated by 7,000 to 8,000 day skiers. The construction of an adequate road to handle those numbers was determined to be contradictory to the intent of the General Plan. To resolve this problem, the plan provided for full expansion of the ski area by designating a 400 plus acre area with a P.U.D. density of one unit per half acre. This high density area was included in order to allow enough overnight facilities to maintain a low daily

15

traffic volume on the Bridger Canyon Road. The plan proposes 1,500 car parking lot spaces for 4,500 day visitors and a possible P.U.D. density for 800 units to serve an estimated 3,000 overnight visitors.

Finally, under Development Rights Allocation, the subsection entitled "Housing," the Base Area Plan states:

> The areas shown for housing are the sites of either existing housing or are subdivided for housing. As the underlying zoning for the Base Area is one dwelling unit per forty acres, it is possible that other single family dwelling units may be located there. However, it is more consistent with the goals of this Plan to encourage the development of high density overnight accommodations in the Base Area. (Emphasis added.)

ZONING ORDINANCE

The Zoning Ordinance states that "[p]ursuant to Section 76-2-101 et. seq. of the Revised Codes of Montana there is hereby adopted a development pattern. Said development pattern shall consist of the Bridger Canyon General Plan and the Bridger Canyon Zoning Ordinance." The Zoning Ordinance also declares that one of the purposes of the zoning ordinance is "to carry out the master or comprehensive plan for the Bridger Canyon Zoning District."

The Zoning Ordinance also provides, under Section 11, entitled "Base Area Recreation and Forestry District," that permitted uses for Recreation and Forestry District land (zoned B-4) include "[o]ne dwelling unit per forty (40) acres." However, on page 41 of the Zoning Ordinance, a Development Rights Allocation chart states that 182 recreational housing development rights have been allocated for the area, which is zoned B-4.

16

The Zoning Ordinance was further amended in 1993, but the amendments were adopted after the Commission conditionally approved 360 Ranch Corporation's application for the PUD.

COMMISSION'S FINDINGS OF FACT AND ORDER OF DECEMBER 17, 1990

In 1990, the Commission approved the request to expand the Bridger Bowl Base Area to included a 100 acre parcel, zoned Recreation Business (B-3), adjacent to the northern boundary of the Base Area. No action was taken on a second parcel, consisting of 260 acres, known as the Hammersmark property, also located adjacent to the Base Area.

COMMISSION'S FINDINGS OF FACT AND ORDER OF JUNE 14, 1991

An application to amend the second parcel (260 acres) to the Base Area, was approved on June 14, 1991, and the Base Area expanded to 760 acres. The 260 acre parcel was zoned Base Area Recreation (B-4). Permitted uses for land zoned B-4 include "one dwelling unit per forty (40) acres. . . ." Finally, a covenant was placed on the Hammersmark property which limited its development potential to seventy (70) units.

As can readily be seen, the language within the General Plan, the Base Area Plan and the Zoning Ordinance, as well as the amendment orders, are internally incongruous and irreconcilable, as well as incompatible with other planning documents. It is unclear which areas allow for only one dwelling unit per 40 acres, which areas allow only one dwelling unit per 20 acres and which areas allow for the development of one dwelling per each one-half acre. The inconsistent language violates the Zoning Ordinance's stated

17

purpose to carry out the master or comprehensive plan for the Bridger Canyon Zoning District and the General Plan's mandate for well-conceived land use planning.

We have previously determined that the General Plan must be followed and the PUD simply does not comply with the General Plan's language. In order for the development patterns and comprehensive (or master) plans to have meaning, they should be followed and must therefore, be consistent enough to be followed.

However, the incongruous language in the planning documents casts confusion upon the appropriate population densities for the various areas of the Canyon. In short, not only do the Zoning Ordinance and the Base Area Plan conflict with the General Plan, when they should harmonize, but they are internally in conflict. To base a decision of conditional approval of a PUD on planning documents which are inherently unreliable is unsatisfactory.

The statutes under which the Commission operates require the Commission to provide well-conceived, clear, consistent planning documents upon which to base land use planning in the Bridger Canyon Zoning District. The powers and duties of the Commission are set forth in §§ 76-Z-101 through 112, MCA. Two sections pertinent to the instant action are § 76-2-103, and § 76-z-104, MCA. Section 76-z-103, MCA, provides that:

> (1) In general, the planning and zoning commission shall have such powers as may be appropriate to enable it to fulfill its functions and duties to promote county planning and to carry out the purposes of this part.

Section 76-2-104, MCA, states that:

18

(1) [f]or the purpose of furthering the health, safety, and general welfare of the people of the county, the county planning and zoning commission hereby is empowered and it shall be its duty to make and adopt a development pattern for the physical and economic development of the planning and zoning district.

(2) Such development pattern, with the accompanying maps, plats, charts, and descriptive matter, shall show the planning and zoning commission's recommendations for the development of the districts, within some of which it shall be lawful and within others of which it shall be unlawful to erect, construct, alter, or maintain certain buildings or to carry on certain trades, industries, or callings or within which the height and bulk of future buildings and the area of the yards, courts, and other open spaces and the future uses of the land or buildings shall be limited and future building setback lines shall be established.

The Zoning Ordinance and the General Plan are the tools by which the Planning and Zoning Commission "fulfill[s] its functions and duties to promote county planning. . ." Section 76-2-103(1), MCA. Moreover, the Zoning Ordinance and the General Plan comprise the Bridger Canyon Development Pattern, which was developed and adopted "for the physical and economic development of the planning and zoning district." Section 76-2-104(1), MCA, and Bridger Canyon Zoning Ordinance, § 1.2 at 4. The Commission erred by approving a PUD which does not comply with the development pattern as a whole. At the core, however, is the fact that it makes little sense to base a decision to conditionally accept the application for a PUD on planning documents which are internally inconsistent and do not harmonize with their companion documents

We conclude that the District Court erred in not addressing the appellant's appeal, under § 76-2-110, MCA, seeking a reversal of the Commission's decision to conditionally approve the PUD application of 360 Ranch. We hold that once a General Plan (master

19

or comprehensive plan), which is part of a development pattern, is adopted, the Commission must substantially comply with that planning document. We further conclude that in order to effectively plan for the development of a planning and zoning district, the planning documents which comprise the development pattern must be internally consistent as well as consistent with companion planning documents. Because the **merits** of the District Court's decision went to the merits of the appeal of the Zoning Commission's decision to approve 360 Ranch's PUD, we reverse the District Court in its conclusion that the Zoning Commission did not exceed its jurisdiction or authority in approving the PUD. AFFIRMED IN PART AND REVERSED IN PART.

_____
                                                Justice

We Concur:

_____
          Chief Justice

_____

_____

_____

_____

_____
          Justices

20